AO 91 (Rev. 02/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
WESTERN DISTRICT OF KENTUCKY

FILED
DISTRICT COURT CLERK
WESTERN DISTRICT OF KY
2011 MAY 24 PM 1:19

UNITED STATES OF AMERICA )
v. )
) Case No. 1:11mj-22
)
**WAAD RAMADAN ALWAN** )
*Defendant*

## CRIMINAL COMPLAINT

I, the complainant in this case, state the following is true to the best of my knowledge and belief.

**In or about and between 2003 to May 2011**, in the county of **Warren** in the Western District of Kentucky, and elsewhere, the defendant violated **Title 18, U.S.C. §§ 2332(b)(2), 2332a(a)(1), and 2339A,** offenses described as follows:

**(1) Conspiracy to Kill a National of the United States; (2) Conspiracy to Use a Weapon of Mass Destruction, and (3) Attempting to Provide Material to Support Terrorists.**

This criminal complaint is based on these facts:

☒ Continued on the attached sheet

[signature]
*Complainant's signature*

RICHARD E. GLENN, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION
*Printed name and title*

*Sworn to before me and signed in my presence.*

Date: May 24, 2011

[signature]
*Judge's Signature*

City and State: Bowling Green, Kentucky

E. ROBERT GOEBEL, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT
*Printed Name and Title*

**MAB/BRC**

# AFFIDAVIT

## INTRODUCTION

I, Special Agent Richard Glenn, being duly sworn, depose and state as follows:

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), where I have been employed since April 1990. I am currently assigned to the FBI's Bowling Green, Kentucky office. My duties with the FBI include investigating federal criminal violations, including international and domestic terrorism, as well as other criminal offenses. As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

2. The information in this affidavit is based upon my training and experience, my personal knowledge of this investigation, and information provided to me by other agents and law enforcement officials who have assisted in this investigation and have experience investigating international terrorism matters. As the co-case agent, I have been involved in all aspects of the investigation of this case from its inception. This affidavit is intended to provide probable cause to support the issuance of the complaint and arrest warrant and does not set forth all of the information that I have acquired during the course of this investigation. Statements of individuals are set forth as summaries unless otherwise indicated.

3. This affidavit is being made in support of a criminal complaint and arrest warrant for WAAD RAMADAN ALWAN (hereinafter, "ALWAN") for violations of Title 18, United States Code, Section 2332(b)(2), Conspiracy to Kill a National of the United States; Title 18, United States Code, Section 2332a(a)(1), Conspiracy to Use a Weapon of Mass Destruction (WMD); and Title 18, United States Code, Section 2339A, Attempting to Provide Material

Support to Terrorists. ALWAN is an Iraqi citizen, formerly residing in Iraq, and entered the United States on or about April 22, 2009 after applying for and receiving refugee status. ALWAN has lived in Bowling Green, Kentucky, since his arrival in the United States.

## SUMMARY OF INVESTIGATION

4. The Bowling Green office of the FBI's Louisville Division initiated an investigation of ALWAN in September 2009. During the course of the investigation, FBI agents utilized, among other things, a confidential human source ("CHS") who met with and engaged in consensually recorded conversations with ALWAN beginning in August of 2010. FBI agents corroborated the CHS's reporting and the consensually recorded conversations through other FBI investigative techniques and methods. The FBI also conducted physical surveillance of ALWAN. In a number of recorded meetings with the CHS, ALWAN discussed his prior activities as an insurgent in Iraq from approximately 2003 until his capture by Iraqi authorities in May of 2006. ALWAN's discussions included, among other things, his participation in numerous Improvised Explosive Device ("IED") attacks on U.S. troops in Iraq. Beginning in September 2010, ALWAN began notionally assisting the CHS in providing material support to terrorists in Iraq. Specifically, ALWAN participated in various operations to provide money, weapons, and diagrams of IEDs, to what ALWAN believed were the mujahidin attacking U.S. troops in Iraq. This affidavit details several, but not all, instances of ALWAN's affirmative acts of attempted material support.

## FACTS SUPPORTING PROBABLE CAUSE

### A. ALWAN's Use of IEDs in Iraq Targeting U.S. Troops

5. On numerous occasions from August 2010 through April 2011, ALWAN

met with the CHS and discussed his prior activities as an insurgent in Iraq. ALWAN's discussions with the CHS included: (1) his history as an insurgent in Iraq; (2) his use of IEDs and sniper rifles to target U.S. forces; and (3) general details about various attacks in which he participated.

6. For example, in a recorded conversation on September 21, 2010, ALWAN told the CHS of an occasion in Iraq when he dropped off two of his fellow insurgents to plant an IED, and it exploded during emplacement, killing them both. ALWAN later explained that he was also very good with a sniper rifle and that his "lunch and dinner would be an American," an apparent reference to his repeated attacks on U.S. troops. During the same conversation, ALWAN stated that he is a "Mujahid" and advised that he cannot go back to Iraq because "I am wanted there." The term "Mujahid" refers to a Muslim engaged in what he considers "Jihad," or a holy war against infidels. He then added, "I didn't come here for America. I came here to get a passport and go back to Turkey, Saudi or wherever I want."

7. In a recorded conversation on September 22, 2010, ALWAN described to the CHS how he became involved in fighting in Iraq. ALWAN explained that he used to procure explosives and missiles, and that his group conducted strikes daily. ALWAN said he collected "everything, TNT, [Unintelligible, "UI"] paste, electric detonators, tank explosive detonators, IED detonators [UI], mortar shells, RPG's, rockets of [UI]..." ALWAN explained how he often emplaced IEDs after curfew, and that it was this activity that led to his being asked to formally join the mujahidin. The CHS told ALWAN that his boss, the Hajji, receives money from Osama Bin Laden (the leader of al Qaida who was wanted by the United States for committing acts of terror, including the World Trade Center and Pentagon attacks on September 11, 2001).

8. During a recorded meeting with the CHS on October 21, 2010, ALWAN drew diagrams of four types of IEDs for the CHS and gave detailed verbal explanations of how to build them and discussed various occasions in which he used these devices against American troops in Iraq. Copies of the drawings provided by ALWAN to the CHS were reviewed by FBI explosives experts who have opined that they appear to come from someone who knows IEDs and understands how to build them. Although the drawings are crude sketches, the explosives experts advised that the devices would be operational if built according to the diagrams. In a recorded conversation on November 8, 2010, ALWAN stated that he used IEDs in Iraq hundreds of times.

9. In or about January 2011, the FBI's Terrorist Explosive Device Analytical Center ("TEDAC") identified 2 latent fingerprints belonging to ALWAN on a component of an unexploded IED that was discovered by U.S. military personnel in Iraq on or about September 1, 2005. The IED was found in a roadway near Bayji, Iraq. ALWAN has advised the CHS that he lived in that area of Iraq and worked at the power plant in Bayji. The IED, consisting of three high explosive artillery rounds and a remote cordless telephone base station, was concealed by gravel, and its wires protruded through the gravel. The fingerprints were found on a Senao brand cordless telephone base station. In recorded conversations with the CHS, ALWAN has discussed how to make IEDs and specifically discussed using the "Seenow" (phonetic) base station as a component of the IED.

10. In a recorded conversation on October 21, 2010, ALWAN discussed with the CHS his participation in IED attacks targeting U.S. forces during the time period 2003 to 2006, and explained that he engaged in this activity with others in his group, including PERSON A [redacted] and

Haytham, among others. ALWAN advised that, on one occasion, he designed a plan with Haytham to plant IEDs near a street detour where traffic usually caused "American vehicles" to slow down. ALWAN stated, "We planted an IED there and another IED was being planted over there, but the IED exploded on Haytham and cut him into pieces." ALWAN further explained that he was there but did not see the explosion because he was "busy planting another IED further away with PERSON A [redacted]." ALWAN stated that this IED incident took place on April 5, 2005. In further discussions regarding PERSON A [redacted], ALWAN stated, "PERSON A [redacted] he lost his eye, his eye fell down when the detonator blew up on him. He was about to set the timer, it wasn't operational yet, and because of a friction, it exploded on him."

11. On December 27, 2005, U.S. forces recovered an unexploded IED in the vicinity of Bayji, Iraq. A component of the IED, a Senao brand cordless base station, was found wrapped in a plastic bag and connected to a timer, batteries, and wires. On September 8, 2010, one latent fingerprint belonging to PERSON A [redacted], was recovered from the plastic bag wrapped around the base station. Reporting indicates that PERSON A [redacted], was detained by U.S. troops in Iraq on or about June 16, 2006, and that he has a prosthetic eye.

B. <u>ALWAN's Material Support to Terrorists</u>

12. Beginning in September 2010, ALWAN participated in operations with the CHS to provide weapons and money to the mujahidin in Iraq. ALWAN also provided expert advice and assistance regarding how to build IEDs, which ALWAN believed were intended for use in insurgent attack operations. On September 21, 2010, the CHS told ALWAN that a group he was affiliated with planned to support the mujahidin in Iraq by shipping them money and weapons.

The CHS explained that his group planned to ship money and weapons to the mujahidin by secreting the items in hidden compartments in vehicles that were being shipped to Iraq. On September 22, 2010, the CHS advised ALWAN that he works for the "Hajji," who "receives money from Osama Bin Laden."

Expert Advice And Assistance Regarding IEDs

13. On October 20, 2010, in a recorded meeting, the CHS told ALWAN that the Hajji "wants you to draw him a picture of an explosive device showing how it's connected and how it becomes...." ALWAN replied, "Okay, okay. I'm not going to draw it for him, tell him that I will implement it practically; I will practically implement it and not draw him a picture of it." ALWAN subsequently agreed and stated, "I will draw it for you." ALWAN told the CHS that it would be easy. ALWAN stated "I will print one for him and then I will make it for him. So it's up to him." The CHS asked ALWAN how many types of IEDs he was familiar with and ALWAN replied, "Four types. The ones that I know I will make them for him and I will tell him these are the ones."

14. On October 21, 2010, in a recorded meeting, the CHS advised ALWAN that he had told the Hajji that ALWAN would draw pictures of 4 types of IEDs. ALWAN replied, "Yes, that's easy. I'll do it all plus provide him with ways to do and prepare it." ALWAN then proceeded to draw diagrams of four types of IEDs, and he gave the CHS detailed verbal explanations of how they worked. At one point, ALWAN mentioned a device called "Seenow" (phonetic), an apparent reference to the Senao brand cordless telephone base station. ALWAN explained, "it's for communications. That's for [unintelligible]. In Arabic, we call it here a telephone....portable....or Motorola device." ALWAN advised, "We started using Seenow, but

Seenow also was canceled later on because the U.S. managed to uncover its code. We used to program it but they were able to penetrate the number. Once they get into that number, they keep pressing and pressing until the explosive device goes off." In describing a particular type of IED, ALWAN talked about filling the container and stated, "anything lethal could be stuffed in it, such as ball-bearings, nails, gravel, and whatever item that kills." ALWAN also discussed how his fellow insurgents, Haytham and Ahmad, had died when their own IED exploded during emplacement. ALWAN stated that this occurred on April 5, 2005. After explaining the building of the IEDs, ALWAN asked, "Do you understand the procedure?" The CHS replied yes and ALWAN stated, "Not that hard, but it needs someone who understands this business, not anyone can do it. One has to have some practical training." The CHS replied, "Are you willing to train some of our people if Hajji asks you to do that?" The CHS explained that ALWAN would be asked to train a cell on this and "they won't bring in the stuff; you just explain it to them." ALWAN replied, "It's easy. It doesn't take much."

15. After drawing the IED diagrams, ALWAN discussed various occasions when he used such devices against American troops in Iraq. ALWAN explained that what he drew for the CHS was what ALWAN "used personally between 2003 and 2006. I used those methods." The CHS asked, "Did you get results from using those devices." ALWAN replied, "Oh yes." ALWAN went on to mention how he and his brother Muhammad "fucked up" Hummers with IEDs. ALWAN also mentioned IED operations targeting Bradley fighting vehicles. Later in the conversation, ALWAN asked the reason that prompted the Hajji to ask about the IEDs and CHS replied that he is not sure of the Hajji's motive. The CHS stated, "He just told me that you have said that ALWAN knows how to make IEDs, so let him draw a diagram of an IED along with

some illustrations. And when I asked why, he said 'because I need it'."

16. The diagrams drawn by ALWAN on October 21, 2010, and provided to the CHS are in FBI custody and copies of the diagrams have been provided to explosives experts for analysis. The explosives experts have opined that the drawings appear to come from someone who knows IEDs and understands how to build them and that the devices would be operational if built according to the diagrams.

17. On January 11, 2011, in a recorded meeting, the CHS brought ALWAN several computer-generated diagrams of IEDs to show ALWAN. The CHS explained that the Hajji had his people take ALWAN's hand-drawn IED diagrams from October and transfer them to the computer using computer graphics. In reality, the FBI had created the computerized versions from ALWAN's drawings. The CHS showed them to ALWAN and asked ALWAN to review them for mistakes. ALWAN then proceeded to mark the diagrams at various places with corrections as he explained the corrections verbally to the CHS. When the CHS asked if they did a good job illustrating one particular drawing, ALWAN replied that they did a good job and it was exactly like ALWAN had explained.

<u>Weapons and Money</u>

18. On November 8, 2010, in a recorded meeting, the CHS told ALWAN, that in "less than three days, there are some weapons, maybe uh, maybe, maybe PKCs, RPG, but not RPG from uh, Russia. American RPG." Continuing, the CHS told ALWAN they would place them in the cars the same way they did it before. The CHS instructed ALWAN to pick up the weapons from a storage facility, place them in bags, and deliver them to the car. The CHS stated, "You will be shocked with the RPGs. It is almost like you see in the movies." ALWAN responded,

"Yes, the assholes built it?" and the CHS said, "Yeah, yeah. It is American." Later, ALWAN asked the CHS, "Any sniper rifles or something else? The most important thing is sniper rifles."

19. On November 9, 2010, the CHS and ALWAN went to an FBI-rented storage facility located in Bowling Green, Kentucky, and examined Rocket-Propelled Grenade launchers (RPGs) and Pulemyot Kalashnikova machine guns (PKMs), which the CHS explained would be taken to the tractor trailer the following day for shipment to Iraq. The weapons had been rendered inert by the FBI. ALWAN later asked how he should move forward with their operations if, for some reason, ALWAN was unable to communicate with the CHS. The CHS explained that in such a situation, someone would take the CHS's place, and would be introduced to ALWAN.

20. On November 10, 2010, the CHS explained to ALWAN, who was attempting to recruit a friend to join in their activities, "I want him to know first of all that this is for al Qaida.." ALWAN responded, "Yes, yes," and the CHS said, "I don't want him to say later on that he wasn't aware of that." The CHS told ALWAN to tell his friend that "the ones here, thank God, are approaching 150 persons," ALWAN responded, "I will tell him everything, but I'll inform him that you'll have the money only."

21. Later that same day, ALWAN went alone to the storage facility to pick up the weapons. ALWAN was captured on video at the storage unit as he opened up a crate containing five PKM machine guns, removed three from the crate, and separated the barrels from the rest of the weapon before placing both parts of the weapons in a duffle bag. He then opened another crate containing RPG launchers, removed three RPG launchers from the crate, and placed all three in a second duffle bag. ALWAN then left the storage facility with the two duffle bags containing the weapons. ALWAN drove to Franklin, Kentucky, to meet the CHS at the FBI-owned tractor

trailer. The CHS asked ALWAN if he brought three of each of the weapons. ALWAN replied yes, and reported which bag contained the PKMs and which one contained the RPGs. ALWAN then removed the duffle bags from the trunk of his car and hoisted them up to the CHS, who immediately placed them in the trunk of a car located in the trailer.

22. On February 15, 2011, the CHS told ALWAN that they had two RPGs, two PKMs, and two sniper rifles for delivery. ALWAN asked, "If I get to Iraq, can you send me a sniper rifle? ... I want one so that I can shoot from far away." The CHS advised ALWAN that there were also two boxes of C4 plastic explosives for delivery. Later that day, ALWAN and Mohanad Hammadi, a fellow Iraqi refugee living in Bowling Green, who ALWAN had recruited to assist with the facilitation network, went to the storage facility to prepare the weapons for delivery the following day. Video cameras captured ALWAN and Hammadi handling the weapons, and placing them in duffle bags. When ALWAN opened one of the sniper rifle cases, before removing the rifle and placing it in a bag for transport, he commented on the weapon's high quality to Hammadi saying, "If this gets to Iraq, only Iraq will have it; there isn't like it in the whole world. Only in Iraq."

23. On February 16, 2011, the CHS met with ALWAN and Hammadi. The CHS advised them that they have to place $100,000 in cash in the tractor trailer, in addition to the weapons. The CHS said that he would go to pick up the money while ALWAN and Hammadi placed the weapons in the tractor trailer. The CHS also told Hammadi, in ALWAN's presence, that "these weapons are not being sent only to al Qaida, they are going to all mujahideen." ALWAN and Hammadi then went to the storage facility to pick up the weapons to deliver to the truck. When the CHS arrived at the truck, ALWAN and Hammadi advised that they had already

placed the weapons in the hidden compartments.

24. On March 15, 2011, the CHS met with ALWAN and Hammadi, telling them that they would do a test run of shipping 2 "Strelas," a reference to Russian-made surface-to-air missile launcher systems; and if successful, they could send 20 or 30 in the next shipment. Later that day, ALWAN and Hammadi went to the FBI-rented storage unit and removed 2 FIM-92A Stinger surface-to-air missile launcher systems, which are similar to Russian-made "Strela" missile systems, from their crates and placed them into bags for transport the following day. Once again, the weapons had been rendered inert by the FBI.

25. On March 16, 2011, ALWAN and Hammadi picked up the bags containing the inert Stinger surface-to-air missile launcher systems from the storage facility and delivered them to the FBI-owned tractor-trailer. ALWAN and Hammadi were captured on video as they loaded the bags into their car at the storage unit and as they placed them in hidden compartments in the trailer's cargo.

<u>STATUTORY PROVISIONS</u>

26. Title 18, United States Code, Section 2332(b)(2) makes unlawful a conspiracy by two or more persons to kill a national of the United States outside the United States, so long as one or more persons do any overt act to effect the object of the conspiracy.

27. Title 18, United States Code, Section 2332a(a)(1) makes it unlawful to use, threaten, or attempt or conspire to use, a weapon of mass destruction against a national of the United States while such national is outside the United States. Under Title 18, United States Code, Section 2332a(c)(2), a "weapon of mass destruction" is defined to include any "destructive device," as defined in 18 U.S.C. § 921.

28. Title 18, United States Code, Section 921(a)(4) defines "destructive device" to include "any explosive, incendiary, or poisonous gas (i) bomb, (ii) grenade, (iii) rocket having a propellant charge of more than four ounces, (iv) missile having an explosive or incendiary charge of more than one-quarter ounce, (v) mine, or (vi) device similar to any of the devices described in the proceeding clauses." In addition, "a destructive device" includes "any combination of parts either designed or intended for use in converting any device into a destructive device, and from which a destructive device may be readily assembled."

29. Title 18, United States Code, Section 2339A makes it unlawful to knowingly provide, conspire, or attempt to provide material support or resources knowing or intending that they would be used in preparation for, or in carrying out, a violation of the listed predicates which include, among others, Title 18, United States Code, Sections 1114, 2332, and/or 2332a(a). Section 1114 relates to the killing or attempted killing of any officer or employee of the United States Government while such officer or employee is engaged in or on the account of the performance of official duties. Section 2332 relates to the killing of a national of the United States while such national is outside the United States. Section 2332a(a)(1) relates to the use, threat, or attempt or conspiracy to use, a weapon of mass destruction against a national of the United States while such national is outside of the United States.

30. Under Title 18, United States Code, Section 2339A(b)(1), "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or

include oneself), and transportation, except medicine or religious materials.

CONCLUSION

Based on the information set forth above, it is respectfully submitted that there is probable cause to believe that WAAD RAMADAN ALWAN has committed the following offenses: Conspiracy to Kill a National of the United States, in violation of 18 U.S.C. §2332(b)(2); Conspiracy to Use a Weapon of Mass Destruction (WMD), in violation of 18 U.S.C. §2332a(a)(1); and Attempting to Provide Material Support to Terrorists, in violation of 18 U.S.C. §2339A.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Special Agent Richard Glenn
Federal Bureau of Investigation

Dated 5/24, 2011.

E. Robert Goebel
United States Magistrate Judge
Western District of Kentucky